# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **TIMOTHY S. MARBURGER** ) | CIVIL ACTION NO. _____ |
| **8687 Arbor Oaks Circle** ) | |
| **Concord, NC 28027,** ) | JUDGE _____ |
| ) | |
| ) | |
| **Plaintiff,** ) | **COMPLAINT** |
| ) | |
| v. ) | |
| ) | **(JURY DEMAND ENDORSED** |
| **JAMES A. WHETSTONE** ) | **HEREON)** |
| **9240 Bay Hill Drive NE** ) | |
| **Warren, OH 44484,** ) | |
| ) | |
| **Defendant.** | |

This case results from Defendant James A. Whetstone's attempts to "squeeze out" his business partner, Plaintiff Timothy S. Marburger, from their joint business ventures. Their businesses, until recent years, worked to the financial benefit of all owners of those ventures. Indeed, for over 25 years, Marburger and Whetstone worked together for the benefit of their businesses and took steps to ensure that they were both treated equally and fairly as business owners who benefited from the financial success of the businesses they built. In recent years, however, Whetstone has taken a series of self-serving and improper actions designed to nullify Marburger's contributions, force out Marburger, and cause harm.

Accordingly, for his Complaint against Defendant James A. Whetstone ("Defendant" or "Whetstone"), Plaintiff Timothy S. Marburger ("Plaintiff" or "Marburger") states and avers the following:

## I. THE PARTIES

1. Marburger is an individual and citizen of the State of North Carolina.

2. Whetstone is an individual and citizen of the State of Ohio. Whetstone resides in Trumbull County, Ohio.

## II. JURISDICTION AND VENUE

3. This Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00 and is between citizens of different states.

4. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(B) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

5. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## III. FACTUAL BACKGROUND

### A. Marburger Purchases First Car Dealership and Develops Key Relationships in Industry.

6. Marburger purchased his first car dealership over 30 years ago in Kannapolis, North Carolina.

7. After purchasing his first dealership, Marburger went on to purchase and/or open 17 additional dealerships.

8. Marburger and Whetstone began doing business together over 25 years ago.

9. Today, Marburger and Whetstone own, jointly and/or with other minority shareholders, six car dealerships. The corporate entities that operate these car dealerships are collectively referred to in the Complaint as the "Car Dealerships" and include the following entities: J.T. Motor Cars, Inc. ("JT Motors"), MDW Motors, Inc.

("MDW Motors"), MW Motors, Inc. ("MW Motors"), WMW Motors, Inc. ("WMW Motors"), JJT Motors, Inc. ("JJT Motors"), and WMD Motors, Inc. ("WMD Motors").

10. Upon and since the acquisition of each Car Dealership, Marburger sat on the Board of Directors and was also an officer of each Car Dealership.

11. Marburger is also a personal guarantor on many, if not all, of the Car Dealerships' loans and/or lines of credit.

12. Every dealership owned by Marburger and Whetstone was purchased because of Marburger's personal connection and relationship with the selling dealer. Said another way, Whetstone is an owner of the Car Dealerships, and has benefited from his ownership of the Car Dealerships, solely because of Marburger's relationships with the selling dealers.

13. Whetstone and Marburger have been in business together for over 25 years. Throughout most of this time, they worked collaboratively to ensure that the businesses were successful and they openly communicated about the businesses.

14. Despite working together for decades, the business relationship between Whetstone and Marburger has changed over the past several years, as a direct result of Whetstone's self-interested and self-serving actions that have harmed Marburger.

**B.** **Whetstone Makes Offer To Buy Marburger's Interests.**

15. In 2020, likely because of the financial success of the Car Dealerships, and in an attempt to squeeze out Marburger, Whetstone approached Marburger and began pressuring him to sell his shares in each of the Car Dealerships. Marburger was not interested in Whetstone's proposed offers.

16. Then, in 2021, Whetstone made a written offer to purchase Marburger's shares in the Car Dealerships. Again, Marburger rejected Whetstone's offer.

17. Shortly thereafter, and seemingly unhappy with Marburger's refusal to sell his shares, Whetstone engaged in a series of self-serving actions, including removing Marburger as an officer and director of the Car Dealerships, making substantial bonus payments to himself, sheltering and offsetting the Car Dealerships' material financial losses incurred in or around 2014 (hereinafter referred to as the "Delta"), and engaging in independent used car sales activities that operate in direct competition with JT Motors. All of these actions demonstrate Whetstone's complete disregard for his fiduciary duties to Marburger and his complete disregard for proper corporate governance of the Car Dealerships.

**C. Whetstone Improperly Calls A Special Meeting To Vote Marburger Out As A Director And Officer And To Give Himself Substantial Bonuses.**

18. On March 8, 2022, Whetstone improperly issued a Notice of Special Meeting of Shareholders and Directors (the "Notice of Special Meeting"). A Notice of Special Meeting was issued for each of the Car Dealerships.

19. The Notice of Special Meeting of each Car Dealership stated that "a special meeting of the Shareholders and Directors will be held on March 14, 2022."

20. The Code of Regulations of each of the Car Dealerships states that only the Secretary of each entity can call a special meeting. Whetstone, however, was not the Secretary of any of the Car Dealership entities when he improperly called the special meeting in March 2022 (the "Special Meeting").

21. Marburger, who resides in North Carolina, received the Notice of Special Meeting only one or two business days before the Special Meeting was scheduled to occur in Ohio.

22. Upon information and belief, Whetstone delayed sending the Notice of Special Meeting to Marburger, because he knew Marburger would have to travel to Ohio from North Carolina in order to attend the Special Meeting, and because by delaying transmittal of the Notice of Special Meeting, Whetstone knew it would decrease the likelihood that Marburger would attend the Special Meeting.

23. Marburger notified Whetstone that he was unable to attend the Special Meeting, given the short notice of the Special Meeting, and because his mother-in-law had recently passed away and the Special Meeting was around the time of the funeral.

24. Whetstone declined to reschedule the Special Meeting.

25. At the Special Meeting, Whetstone then proceeded to remove Marburger as a director and officer of each of the Car Dealerships.

26. In addition, Whetstone approved 2021 bonuses to himself totaling $1,475,000. Whetstone also approved other employee bonuses for 2021 totaling $2,171,500.

27. The Car Dealerships have never given bonuses to employees in such substantial amounts, and in fact, Whetstone had never previously received any bonuses.

28. The unprecedented bonuses that were made in 2021 continued into 2022. In 2022, approximately $3 million in bonuses were paid to Whetstone and other employees. The payment of these bonuses is damaging to Marburger as a shareholder because it has reduced the value of the Car Dealerships.

29. During the Special Meeting, the shareholders and directors in attendance also, among other things: (i) authorized "the elimination of the 'DELTA' from long-term assets"; (ii) gave the President of each Car Dealership the authority to, in his discretion,

"set future bonuses for key employees for the year 2022 and each year thereafter without further action by the Shareholders and Directors"; and (iii) "voted to approve all of the actions of the Officers and Directors of the corporation over the preceding years as fully authorized by the corporation."

### D. Elimination Of The "Delta" At Special Meeting.

30. In 2015, accounting firm Schneider Downs analyzed the underlying accounting data for the Car Dealerships to determine the accuracy of each of the entities' internal financial statements.

31. During its review, Schneider Downs discovered that an account maintained at Key Bank, N.A. by Whetstone's management company, Whetstone Motors, Inc. ("Whetstone Management"), received daily deposits of cash from each of the Car Dealerships, that checks and/or disbursements were not properly recorded, and that funds from the Car Dealerships were comingled with the Whetstone Management account and not properly tracked or monitored. Schneider Downs concluded that this resulted in funds from the Car Dealerships, totaling over $2.3 million, being unaccounted for and missing. According to Schneider Downs, these missing funds were the direct result of actions taken by Whetstone and/or Whetstone Management.

32. Whetstone was the sole person responsible for managing the Whetstone Management bank account and had access to all funds in that account. In addition, Whetstone's management company, Whetstone Management, was charging management fees to each of the Car Dealerships, further evidencing the control and involvement that Whetstone and Whetstone Management had in the oversight and management of the Car Dealerships.

33. The over $2.3 million in funds missing from the Car Dealerships was ultimately recorded and allocated over the books and records of four of the Car Dealerships (JJT Motors, JT Motors, MW Motors, and WMD Motors) and identified as a Delta in the long-term assets section of each balance sheet. Schneider Downs, however, reported that the over $2.3 million in funds missing affected a total of nine entities that included eight Car Dealerships (two in which Marburger had no ownership interest), and Whetstone Management.

34. Upon information and belief, Whetstone directed the CFO of the Car Dealerships to record and allocate these missing funds over the books and records of only four Car Dealerships, even though the missing funds affected five other entities (two in which Marburger had no ownership interest). This was designed to harm and create a financial burden on these four dealerships, all of which Marburger has an interest in.

35. At the Special Meeting, and as reflected in the minutes of the Special Meeting for each Car Dealership, each Car Dealership's portion of the Delta was written off as an unrecoverable asset. In other words, the Delta was deleted from the books and records of the four Car Dealerships.

36. When Whetstone learned of Schneider Downs' findings, he asked Schneider Downs to change the characterization of its finding that his management company was responsible for and had access to the $2.3 million that was missing from the Whetstone Management account. Schneider Downs refused to make any changes to their findings and Whetstone subsequently fired Schneider Downs.

**E.     Whetstone Is Operating Used Car Dealerships That Compete With JT Motor Cars, Inc.**

37.     Whetstone owns and operates an entity known as WM Motors LLC (dba Car Culture, and referred to herein as "Car Culture"). Car Culture is in the business of selling used cars.

38.     WMS Motor Sales, Ltd. (dba Patriot Motors of Cortland, and referred to herein as "Patriot Motors") is also an entity owned and controlled by Whetstone. Like Car Culture, Patriot Motors is in the business of selling used cars.

39.     Mr. Marburger does not have an ownership interest, or any interest, in Car Culture or Patriot Motors.

40.     Car Culture and Patriot Motors do business and are located within seven miles of JT Motors, which is an entity in which Marburger does have an ownership interest.

41.     Marburger never agreed that Whetstone could operate two competing used car dealerships—Car Culture and Patriot Motors—so close in proximity to JT Motors, and despite doing business together for over 25 years, Whetstone never discussed the operation of both of these used car dealerships, or the location of these car dealerships, with Marburger.

42.     Upon information and belief, Whetstone uses the bank account, office and administrative services of certain personnel, and other resources of JT Motors for the benefit of Car Culture and Patriot Motors. For example, Marburger has learned that JT Motors processes the payroll for employees of Car Culture and Patriot Motors. Upon information and belief, money belonging to JT Motors may be intermingled with money belonging to Car Culture and/or Patriot Motors. Upon information and belief, the sharing

of resources, financial and otherwise, by and among Car Culture, Patriot Motors and JT Motors was not accounted and/or bargained for in an arm's length manner.

43. Upon information and belief, Whetstone's use of the bank account, office and administrative services of certain personnel, and other resources of JT Motors, and Whetstone's operation of Car Culture and Patriot Motors so close in proximity to JT Motors, has negatively impacted the value of JT Motors and the value of Marburger's ownership interest in JT Motors.

**F. Breach of Share Restriction Agreement**

44. Whetstone and Marburger entered into a Share Restriction Agreement dated January 1, 1998. The Share Restriction Agreement sets forth certain restrictions on the transfer of the shares of JT Motors (fka Denny Clegg Motors, Inc.).

45. A true and accurate copy of the Share Restriction Agreement, along with any amendments (hereinafter and collectively, the "Share Restriction Agreement"), is attached as Exhibit A.

46. Pursuant to the Share Restriction Agreement, the shareholders of JT Motors are prohibited from disposing of their shares of JT Motors, "except in accordance with the terms and conditions" of the Share Restriction Agreement.

47. Pursuant to Section 9 of the Share Restriction Agreement, "no Shareholder (hereinafter referred to as the "Selling Shareholder") shall dispose of all or any of his Shares, now owned or hereafter acquired by such Shareholder, without the unanimous written consent of all of the Shareholders or, in the absence of such unanimous written consent, without first giving to all of the Shareholders and the Company at least 60 days prior written notice (hereinafter referred to as the "Selling Shareholder's Notice") of his intention to dispose of such Shares."

48. Whetstone transferred and/or sold shares of JT Motors to Krystie Whetstone, Karli Datish, and possibly others, which transfers and/or sales were in breach of the Share Restriction Agreement (the "Prohibited Share Transfers").

49. Whetstone breached the Share Restriction Agreement, by among other things, not complying with Section 9 of the Share Restriction Agreement, and by not obtaining the unanimous written consent of all shareholders of JT Motors and by not giving written notice to all shareholders at least 60 days in advance of his intention to transfer shares.

## COUNT ONE
**(Breach of Fiduciary Duty of Loyalty and Good Faith)**

50. Marburger hereby incorporates each and every paragraph set forth above as if fully re-written herein.

51. Whetstone owes fiduciary duties of loyalty and good faith to Marburger.

52. Whetstone, as a director and officer of the Car Dealerships, had a fiduciary duty to Marburger to, among other things, maximize shareholder value and to act in his best interests.

53. Whetstone knew that the removal of Marburger as a director and officer of the Car Dealerships, the payment of bonuses to himself and to certain employees, and the elimination of the Delta from the books and records of the Car Dealerships in which Marburger has an interest, would punish and be harmful to Marburger. Indeed, the Delta was isolated and recorded in the financial books of only four of the Car Dealerships, all of which Marburger had an interest in. Whetstone avoided allocating and recording the Delta in the financial books of the entities that Marburger did <u>not</u> have an interest in, which was in direct conflict with Schneider Downs' findings.

54. Whetstone also knew that operating Car Culture and Patriot Motors so close in proximity to JT Motors would be harmful to JT Motors, and as a result, harmful to Marburger.

55. Whetstone exercises influence and control over the Car Dealerships and their respective employees, and he actively promoted, and continues to promote, his own interests—all to the detriment of Marburger.

56. Whetstone breached his fiduciary duties of loyalty and good faith by taking these actions and by not considering the impact that these actions would have on Marburger's ownership interests in the Car Dealerships.

57. Whetstone breached his duty of loyalty, and his corresponding duty of good faith, by advancing his own interests and by failing to maximize shareholder value.

58. Had Whetstone acted in the best interests of his fellow shareholder, Marburger, he would not have removed Marburger as an officer and director of the Car Dealerships, he would not have authorized and restricted the elimination of the Delta on the books and records of only four of the Car Dealerships (which was in direct conflict with Schneider Downs' findings), he would not operate two competing businesses so close in proximity to JT Motors, and he would not have paid multi-million dollar bonuses to himself.

59. Whetstone committed the wrongful acts alleged herein with a conscious disregard for the rights of Marburger and in a manner that Whetstone knew would cause harm to Marburger.

60. As a result of the foregoing actions and omissions of Whetstone, Marburger has been harmed and his shares in the Car Dealerships have been improperly diluted.

## COUNT TWO
### (Breach of Fiduciary Duty of Care)

61. Marburger hereby incorporates each and every paragraph set forth above as if fully re-written herein.

62. Whetstone owed a fiduciary duty of due care to Marburger and the Car Dealerships to, among other things, act on an informed basis.

63. Whetstone failed to consider the impact of his actions when he made bonus payments to himself and certain employees, when he isolated, recorded, and then eliminated the Delta from the books and records of just four Car Dealerships (all of which Marburger had an interest in), and when he removed Marburger as an officer and director of the Car Dealerships. In addition, and as explained above, Whetstone knew that operating Car Culture and Patriot Motors so close in proximity to JT Motors would be harmful to JT Motors, and as a result, harmful to Marburger.

64. By failing to give any consideration to the impact of these actions on Marburger, Whetstone breached his duty of care.

65. Whetstone exercises influence and control over the Car Dealerships and their respective employees, and he actively promoted, and continues to promote, his own interests—all to the detriment of Marburger.

66. Whetstone committed the wrongful acts alleged herein with a conscious disregard for the rights of Marburger and in a manner that Whetstone knew would cause harm to Marburger.

67. As a result of the actions and omissions of Whetstone, Marburger's shares in the Car Dealerships has been improperly diluted.

## COUNT THREE
### (Breach of Share Restriction Agreement)

68. Marburger hereby incorporates each and every paragraph set forth above as if fully re-written herein.

69. The Share Restriction Agreement is a binding contract between and among Marburger, Whetstone, and other parties.

70. The Share Restriction Agreement places restrictions and limitations on the ability of a shareholder of JT Motors to transfer and dispose of shares. Specifically, Section 9 of the Share Restriction Agreement provides that "no Shareholder (hereinafter referred to as the "Selling Shareholder") shall dispose of all or any of his Shares, now owned or hereafter acquired by such Shareholder, without the unanimous written consent of all of the Shareholders or, in the absence of such unanimous written consent, without first giving to all of the Shareholders and the Company at least 60 days prior written notice (hereinafter referred to as the "Selling Shareholder's Notice") of his intention to dispose of such Shares."

71. By transferring and/or selling certain of his shares in JT Motors to Krystie Whetstone, Karli Datish, and possibly others, Whetstone breached the Share Restriction Agreement. Whetstone may have breached the Share Restriction Agreement in other ways, which may be revealed during discovery in this action.

72. Marburger has fully complied with the terms of the Share Restriction Agreement.

73. These Prohibited Share Transfers further illustrate Whetstone's disregard for corporate governance and his disregard for his fiduciary obligations to Marburger, which has harmed Marburger.

WHEREFORE, Plaintiff Timothy Marburger, on behalf of himself individually and derivatively on behalf of the Car Dealerships prays for judgment as follows:

(1) For money damages against Whetstone, for all losses and damages suffered as a result of the acts and transactions complained of herein; and

(2) For rescission of the removal of Marburger as an officer and director of the Car Dealerships;

(3) For pre-judgment interest, post-judgment, punitive damages, attorney fees, expert fees, and the costs incurred in bringing this action; and

(4) For all other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff Timothy S. Marburger demands a trial by jury as to all issues so triable.

Respectfully submitted,

*s/ Julie A. Crocker*
Julie A. Crocker (0081231)
*jcrocker@taftlaw.com*
Jack Maib (0098846)
*jmaib@taftlaw.com*
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Phone: (216) 241-2838
Fax: (216) 241-3707

*Attorneys for Plaintiff Timothy Marburger*